**UNITED STATES of America, Plaintiff,**

v.

**Timothy RUCKER, et al., Defendants.**

**No. 97–CR–1146 (ILG).**

United States District Court,
E.D. New York.

Jan. 11, 1999.

Kelly Moore, Assistant U.S. Attorney, Brooklyn, NY.

Ira D. London, New York City.

Frank Geoly, Brooklyn, NY.

Donna Newman, New York City.

Steven Bernstein, New York City.

Joel Walter, Brooklyn, NY.

Charles Hochbaum, Hochbaum & Weiss, Garden City, NY.

Roger Bernstein, New York City.

Bernard Udell, Brooklyn, NY.

Lloyd Epstein, New York City.

Anthony L. Ricco, Ricco & Villavueva, New York City.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

A plethora of motions have been made by one or more of the defendants named, some of which have been decided from the bench following a hearing, and some of which as yet remain undecided and will be addressed now.

### I. *Motions for Severance*

Eight defendants, Hutchinson, Williams, Johnson, Kearse, Cumberbatch, Arroyo, Straight and Nix, have moved this court for an order that would sever the trial of each of them from that of the others. The common thread running through the motions is that each would be prejudiced by the spillover of evidence admissible as to some, but not as to others. Rucker has moved to be severed from Arroyo or, in the alternative, to suppress statements made by Arroyo. Since those statements have been suppressed following a hearing, Rucker's motion is moot.

Ten defendants in all are named in a 22 count indictment in which all are named as members and associates of a criminal organization known as the "C.I.C./Caveman" (the "enterprise") engaged in various forms of criminal activity including murder, attempted murder, assault, robbery, racketeering, racketeering conspiracy, and using and carrying a firearm in aid of a violent crime.

Multiple defendants may be properly joined if the requirements of Rules 8(b) and 14 of the Federal Rules of Criminal Procedure are satisfied. Rule 8(b) provides that two or more defendants may be charged in the same indictment "if they are alleged to have participated ... in the same series of acts or transactions constituting an offense or offenses." Once Rule 8(b) has been satisfied, the issue of severance is then determined by reference to Rule 14.

In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) the Supreme Court reaffirmed the preference for joint trials of defendants who are indicted together, a preference expressed many times before. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The liberal rule of joinder is designed to promote efficiency and "serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210, 107 S.Ct. 1702. Joint trials, in addition, limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury. *See, e.g., United States v. Stillo*, 57 F.3d 553, 556–57 (7th Cir.), *cert. denied*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995). The requirement of the Rule that the defendants are alleged to "have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses" must be read to mean that the acts must be "unified by some substantial identity of facts or participants" or "arise out of a common plan or scheme." *United States v.*

*Attanasio,* 870 F.2d 809, 815 (2d Cir.1989) (*quoting United States v. Porter,* 821 F.2d 968, 972 (4th Cir.1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988)). Proper joinder is determined from the face of the indictment which quite plainly here, satisfies the Rule 8(b) requirement that the acts are unified by the substantial identity of the participants and arise out of the objectives sought to be accomplished by the enterprise with which all the defendants are alleged to be associated. The fact that not every defendant is charged in every count is not dispositive. Participation in a series of transactions does not require participation in every transaction. *United States v. Teitler,* 802 F.2d 606, 615 (2d Cir.1986).

Rule 8(b) having been satisfied, we turn to Rule 14 which provides, in relevant part, that "If it appears that a defendant ... is prejudiced by joinder of ... defendants ... for trial together, the court may order ... separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." The Advisory Committee Notes instruct and the courts have uniformly held that severance and other similar relief rests entirely in the discretion of the court. *See, e.g., United States v. Losada,* 674 F.2d 167 (2d Cir.1982); *United States v. Lasanta,* 978 F.2d 1300, 1306 (2d Cir.1992). The preference in the federal system for joint trials and the role they play in the criminal justice system has already been noted and to a significant extent informs the discretion to be exercised.

■■■ *Zafiro* acknowledged that a "district court should grant a severance ... only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant.... When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." 506 U.S. at 539, 113 S.Ct. 933. The Court went on to observe, however,

that less drastic measures than severance, such as limiting instructions, will frequently cure any risk of prejudice and that it was well settled that "defendants are not entitled to severance merely because they have a better chance of acquittal in separate trials." 506 U.S. at 539–40, 113 S.Ct. 933. The Courts have had many occasions to apply and in the process amplify the broad statement of principles in *Zafiro.* In *United States v. Rosa,* 11 F.3d 315 (2d Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994) for example, the Court explained that "A defendant's right to a fair trial does not include the right to exclude relevant and competent evidence. Thus, the fact that testimony against a co-defendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately." 11 F.3d at 341. Neither is it a ground for severance that a defendant is named in fewer counts than his co-defendants. *See, e.g., United States v. Chang An–Lo,* 851 F.2d 547, 556–57 (2d Cir.1988), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988) ("differing levels of culpability and proof are inevitable in any multi-defendant trial and standing alone are insufficient grounds for separate trials."); *United States v. Harris,* 908 F.2d 728 (11th Cir.1990), *cert. denied,* 498 U.S. 1093, 111 S.Ct. 979, 112 L.Ed.2d 1063 (1991).

As has been noted, each of the defendants moving for a severance is alleged to be a member and associate of the enterprise and not all of them are named in each of the 22 counts. Some are charged more frequently than others but that difference does not preclude charging and trying them jointly. *See, e.g., United States v. Locascio,* 6 F.3d 924 (2d Cir.1993). Their assertions that a severance is warranted because much evidence will be received against co-defendants which will not be relevant to the crimes with which the movants are charged are not persuasive. That circumstance does not warrant granting the relief sought. "We recognize" said the Court, that "these appellants may have suffered some prejudice when they were forced to sit ... for over a month without any evidence being introduced concerning their activities. Nonetheless, a disproportionate

introduction of evidence relating to joined defendants does not require a severance in every case." *United States v. Cardascia,* 951 F.2d 474, 483 (2d Cir.1991).

The movants have failed to sustain the burden they must bear of demonstrating that they will be so severely prejudiced by a joint trial that they would be deprived of a fair trial and their severance motions are denied.

## II. *The Bruton Motions*

■ The defendants Rucker, Arroyo, Straight and Johnson, made statements to law enforcement officers which refer to some of their co-defendants by name. The statements made by Arroyo have been suppressed following a hearing and are, therefore, no longer relevant. Invoking *Bruton v. United States* and its progeny, the defendants Kearse, Hutchinson, Nix, Straight, Williams, Cumberbatch, Rucker and Johnson moved for severance, a suppression of statements and/or a redaction of them.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the confrontation clause of the Sixth Amendment was offended when a defendant's statement implicating a co-defendant was placed before the jury in their joint trial despite the cautionary instruction that the statement was to be considered only against the declarant who did not testify and was, therefore, not subject to cross-examination. *Bruton* was followed by *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) in which the Court held that where a co-defendant's statement "was not incriminating [to the defendant] on its face, and became so only when linked with evidence introduced later at the trial" it was proper to indulge the presumption that a jury would heed the court's limiting instruction to consider the co-defendant's statement only against him. In so holding, the Court declined to extend *Bruton* but expressed "no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." 481 U.S. at 211, n. 5, 107 S.Ct. 1702. *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), the most recent pronouncement on the issue, is principally relied upon for the vigorous assertion

that the statements cannot be sanitized by substituting neutral pronouns for the named co-defendants and the statements must be suppressed. In this, the defendants are mistaken.

In *Gray,* Anthony Bell confessed that he, Gray and another man murdered the victim. Bell and Gray were indicted for murder and were tried jointly. Bell's confession was permitted to be read to the jury by the trial judge. In reading it, the reader said "deleted" or "deletion" whenever Gray's name appeared. Immediately after that reading, the prosecutor asked "after Bell gave you the information, you subsequently were able to arrest Gray, is that correct?" The reader answered "yes." The State also introduced a written copy of the confession with the name omitted, leaving in its place blanks. The jury was given a limiting instruction to the effect that the confession could be used as evidence only against Bell, not Gray. The jury convicted the defendants. The intermediate appellate Court of Maryland agreed with Gray that the confession ran afoul of *Bruton* and set aside his conviction. The highest court of Maryland disagreed and reinstated his conviction. The Supreme Court granted certiorari and vacated the judgment of the Maryland court. The Court held at 523 U.S. at ——, 118 S.Ct. at 1155:

> *Bruton,* as interpreted by *Richardson,* holds that certain "powerfully incriminating extra judicial statements of a co-defendant"—those naming another defendant—considered as a class, are so prejudicial that limiting instructions cannot work. Unless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found. Redactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that, in our view,

the law must require the same result. (citations omitted).

The defendants seize upon Footnote 5 in *Richardson* at 481 U.S. at 211, 107 S.Ct. 1702 in which the Court stated "We express no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun" and interpret *Gray* as deciding that open question and as requiring the suppression of statements in which such replacements have been made. This Circuit and others have uniformly admitted confessions which have been redacted to replace the names of co-defendants with pronouns or similarly neutral words in cases decided after *Richardson*. In *United States v. Williams*, 936 F.2d 698 (2d Cir.1991) the confession was redacted to replace the name of the defendant with the word "guy." In rejecting Williams' attack upon the admission of the confession as thus redacted, the Court wrote, at 700–01:

> These decisions have uniformly held that the appropriate analysis to be used when applying the *Bruton* rule requires that we view the redacted confession in isolation from the other evidence introduced at trial. If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant. *This analysis is adopted directly from Richardson itself, and the principal extension of Richardson by our decisions is that they allow redacted confessions to refer to accomplices with neutral pronouns.* (emphasis added).

Cases which have been decided since *Gray v. Maryland* have uniformly reached the same result. *See, e.g., United States v. Edwards*, 159 F.3d 1117 (8th Cir.1998) (references to co-defendants by name replaced with neutral pronouns such as "we," "they," "someone," and "others"); *United States v. Stockheimer*, 157 F.3d 1082 (7th Cir.1998); *Herrera v. United States*, 1998 WL 770559 (S.D.N.Y.1998); *United States v. Cambrelen*, 18 F.Supp.2d 226 (E.D.N.Y.1998); *But see United States v. Peterson*, 140 F.3d 819 (9th Cir.1998) (replacing defendant's name with "Person X" impermissible under *Gray*); *United States v. Valdez*, 146 F.3d 547 (8th Cir.1998); *United States v. Hickman*, 151 F.3d 446 (5th Cir.1998) (blocking out co-defendant's name with marker impermissible under *Gray*). *See also* 112 Harv.L.Rev. 142 (1998) for critical assessment of *Gray*.

The reference to the co-defendants by name in the statements made by others were either redacted entirely or were replaced by "someone"; "that person" (relating back to "someone"); "people"; "an individual"; neither of which run afoul of *Gray*. That *Gray* does not abjure the holding in *Richardson* and does not flatly prohibit the substitution of neutral pronouns and symbols for names is fairly deduced from the following excerpt from the opinion at 118 S.Ct. at 1157:

> Additional redaction of a confession that uses a blank space, the word "delete," or a symbol, however, normally is possible. Consider as an example a portion of the confession before us: The witness who read the confession told the jury that the confession (among other things) said,
>
> "Question: Who was in the group that beat Stacey"
>
> "Answer: Me, deleted, deleted, and a few other guys."
>
> . . .
>
> Why could the witness not, instead, have said:
>
> "Question: Who was in the group that beat Stacey?"
>
> "Answer: Me and a few other guys."

The motions to suppress the statements are accordingly denied.

### The Search and Seizure Motions

#### A. Apartment 5B, 1167 Stanley Avenue

Nix has moved to suppress the items seized in the course of a search of apartment 5B, 1167 Stanley Avenue. He contends that the initial entry into the apartment by police officers to execute an arrest warrant was unlawful and fatally flawed the search warrant grounded in the affidavit of the same police officers and which described what they observed in the apartment during the execution of the arrest warrant.

On December 15, 1997, warrants were issued for the arrest of all the defendants based upon an indictment which had been returned that day and in which all were named. On the same day, December 15, 1997, Magistrate Judge Pollak issued search warrants for an apartment at 1212 Lorring Avenue and for an apartment at 1165 Stanley Avenue. The affidavit in support of an application for those warrants described both apartments as being closely linked to the criminal activity of the C–I–C/Caveman gang (the "gang"). During the search of the Lorring Avenue apartment, officers interviewed its occupant who confirmed that the gang had used the apartment to store guns and narcotics. The occupant also told the officers that Nix and other members of the gang who were the subjects of the arrest warrants referred to above, were using an apartment at 1167 Stanley Avenue to store contraband. The precise apartment was not known by the informant other than that it faced the back of the building. Based upon additional information detailed in the affidavit of Special Agent John Mulligan of the F.B.I. in support of the application for a search warrant of the subject apartment, police went to the fifth floor of 1167 Stanley Avenue and forcibly entered apartment 5B to execute the arrest warrants for defendants Straight, Arroyo and others. A security sweep of that apartment exposed Arroyo, Nix and Straight hiding in various places and also provided a view of a bullet proof vest and bags used to carry "bombs," the term used to describe bags that carry 100 vials of crack cocaine. I would note in passing, that although the police could arguably have properly seized the items which were in plain view having been in the apartment lawfully and inadvertently discovering items which they surely had probable cause to believe were evidence of a crime, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Jackson*, 778 F.2d 933 (2d Cir.1985); *United States v. Levasseur*, 816 F.2d 37 (2d Cir.1987), they did not, but instead made application for a search warrant which was duly issued by Magistrate Judge Pollak on December 16, 1997.

In a motion to suppress physical evidence, the burden of proof is on the defendant who seeks the suppression. *United States v. Feldman*, 606 F.2d 673 (6th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980). Once the defendant, however, has established some basis for the motion, then the burden shifts to the government to show that the search was lawful. *United States v. Sacco*, 563 F.2d 552 (2d Cir.), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1978). The standard of proof in this regard is a preponderance of evidence. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Considerable discussion has been devoted to the propriety of events surrounding the execution of the arrest warrants and the implications of that event for the search pursuant to a warrant conducted thereafter. In my view, that discussion is superfluous and has no bearing on the issue of whether the contraband seized should be excluded from evidence. The questions to be asked, the answers to which are dispositive, are: (1) Was the search warrant properly issued? and, (2) if not, was the police officer's reliance upon the magistrate judge's probable cause determination and on the technical sufficiency of the warrant issued objectively reasonable?

To satisfy the warrant requirement of the Fourth Amendment, an impartial, judicial officer must assess whether the police have probable cause to conduct a search, or to seize evidence, instrumentalities, fruits of a crime or contraband. *See, e.g., Warden v. Hayden*, 387 U.S. 294, 301–02, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The magistrate must consider the facts and circumstances in a practical common sense manner and make an independent assessment regarding probable cause. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The determination by a magistrate that a warrant should issue is to be accorded great deference when reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). An application of those basic principles to the affidavit of Special Agent John Mulligan drives the court to conclude that considering the facts and circumstances it

describes in a practical common sense manner there is more than sufficient probable cause to conduct the search. To entertain the argument that Special Agent Mulligan's affidavit was wanting in that regard is to invite the second guessing of police decisions by reviewing the evidence described in his affidavit in a light least favorable to that experienced law enforcement officer and to make police work an even more risky undertaking by subjecting difficult decisions to such a test.

If Special Agent Mulligan's affidavit were required to be parsed so as to separate that portion describing the execution of the arrest warrant from the balance of it, there would still be more than a sufficient basis for a common sense, practical and independently objective determination that probable cause existed to search the subject apartment.

The answer to the second question posed is compelled by *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The officer's reliance upon Magistrate Judge Pollak's probable cause determination and on the facial and technical validity of the warrant was objectively reasonable. For the foregoing reasons the motion by defendant Nix is denied.

### B. *The Utica Searches*

■ The defendant Hutchinson has moved to suppress the items seized upon the execution of three search warrants, viz: On March 10, 1995, a search warrant was issued by the Utica City court for 1334 Lincoln Avenue, Utica, New York. On March 15, 1995, two warrants were issued by that court—one for 1004 George Place and one for the contents of safety deposit boxes numbered 73 and 2117 located in the Savings Bank of Utica, 233 Genesee Street, Utica, New York. The challenge to these warrants is aimed principally at the first for 1334 Lincoln Avenue, it being the defendant's position that the others were issued in reliance upon the yield of that warrant and are, therefore, invalid.

The facts surrounding the issuance of the Lincoln Avenue warrant are clearly ascertained from an examination of Exhibits A, B and C attached to the defendant's Reply Memorandum in Support of his Motion, and from a transcript of the Oneida County Court proceeding on January 30, 1996, in the case of *People v. Hutchinson,* Ind. # 95–130.

Exhibit A is a redacted copy of the testimony of an informant given under oath on March 10, 1995, in the Utica City Court. After eliciting very specific information from the informant regarding the place to be searched, the names of the persons who may be found there, the contraband he saw there and the criminal activity conducted there, the following colloquy appears:

> *The Court:* All right do you want to sign your statement here on all the places that they have indicated, and you swear that everything in that statement is the truth?
>
> A: Yes.
>
> *The Court:* And you swear to [sic] that everything you have told me other than the statement, and answers to my questions is the truth?
>
> A: Yes.
>
> *The Court:* Any place where there are corrections you put your initials.... Are you giving this statement of your own free will?
>
> A: Yes.
>
> *The Court:* No one is coercing you to say these things, are they?
>
> A: No.
>
> *The Court:* And the Utica Police didn't threaten you to make you give this statement, did they?
>
> A: No.
>
> *The Court:* No. Today is the 10th. *I'll change it. Let's make the record clear, that this is the 10th of March 1995.* We are in my office and it's 4:35 to 4:40 p.m.
>
> *The Court:* When you made the buy is that on the 10th also?
>
> A: Yes, it would be the 10th.
>
> *The Court: Correct all that too on the statement and make it correct so when you say that this buy that you made it was made the 10th day of March, not the 9th, is that correct?*
>
> A: Yes.

*The Court:* And that's today?

A: Yes.

(emphasis added)

A plain reading of the portion of that transcript set out above can leave no doubt that in addition to his sworn testimony, the informant also signed a statement and swore to the truthfulness of its contents. It is also patently plain that the judicial officer directed that the date on that statement be changed to reflect that it was made on the 10th and not the 9th of March. It is also clear that "the buy" made by the informant was on the day his testimony was given and his statement signed.

In addition to that testimony and that statement, Investigator Bernard Vennero executed an affidavit in support of his application for a search warrant of the subject premises (Gov.Mem. in Opposition, Ex. L). The information in that affidavit was also sworn to and provided orally in the same proceeding in which the informant's testimony was given and is also reflected in the same transcript in Exhibit A. I note that his affidavit and his testimony assert his belief in the reliability of the informant and the consistency of the informant's information with what is otherwise known to Investigator Vennero. They also reflect that surveillance and the investigation of 1334 Lincoln Avenue have been in progress for approximately six weeks.

On January 30, 1996, nearly 11 months after the issuance of the search warrant, a hearing was held in the Oneida County Court to determine its validity. The transcript of that proceeding is attached to a letter dated June 17, 1998, from the defendant to the Court. Without commenting upon the correctness of the decision reached at the conclusion of that hearing, suffice it to say that the Court declared the warrant invalid for the reasons that the testimony of the informant "revealed no dates, no times relative to this illegal activity taking place, and therefore I find the application for the issuance of the search warrant of 1334 Lincoln Avenue was insufficient on its face. A warrant should not have been issued. There is no indication as to the dates alleged by the informant. This court has no way to know whether this information is one week old, or five and a half weeks old, and there is nothing else to support the issuance of a search warrant at that location by the issuing Magistrate, and this Court hereby suppresses the evidence seized at 1334 Lincoln Avenue...." (Tr. of that proceeding at pp 12–13).

It would appear from the foregoing excerpt and later confirmed, that only the redacted transcript of the informant's testimony was before the Court and his sworn statement was not.

A motion for reconsideration of the decision to suppress was made by the Oneida County District Attorney within a week thereafter. (See Ex. C to Defendant's Reply Memorandum). Attached to that motion was an affidavit of Chief Utica City Court Judge Anthony J. Garramone who issued the search warrant on March 10, 1995. In it, he swears that he reviewed the application for a search warrant made by the Special Investigations Unit of the Utica Police Department; that he reviewed the application, interviewed the confidential informant in chambers on the record, and reviewed the written deposition of the confidential informant; that he witnessed the signature of the confidential informant and affixed his signature at the bottom thereof and that after reviewing the foregoing, he granted the application for a search warrant for the second floor apartment of 1334 Lincoln Avenue.

In a decision issued March 1, 1996, the Oneida County judge who, for the first time, had the informant's affidavit together with his testimony before him, vacated his prior decision and held that "Based on the testimony of the confidential informant before the issuing magistrate, on or about March 10, 1995, this Court finds that there was probable cause for the issuance of the search warrant." It is important to note that in that decision the court also made the following observation: "The affidavit which the people are now asking this Court to consider obviously should have been provided to the Court previously but the affidavit of the issuing magistrate establishes beyond question that this evidence was before him at the time of the search warrant application. *It clearly*

*was not manufactured or 'tailored' to conform to this Court's prior decision.*" (emphasis added).

The thrust of the attack upon the Lincoln Avenue search warrant is that the belated appearance of the informant's affidavit is highly suspicious and the corrections patent on its face raises the spectre of tampering. Those assertions are disingenuous as an examination of the record convincingly establishes. The transcript of the March 10th proceeding before Judge Garramone clearly references a statement signed by the informant at the time he testified and clearly reflects a change in the date made by or at the direction of the judge.

This court's independent review of the transcript of March 10, 1995, the informant's affidavit and the affidavit of Investigator Bernard Vennero leaves no doubt that the search warrant was issued with an abundance of evidence of probable cause to issue it and in full satisfaction of the Fourth Amendment. The motion to suppress the items seized in execution of the search warrants is denied.

*Johnson's Motion to Suppress Statements*

To fully grasp the nuances of this motion, an understanding of the sequence of events leading up to the statements sought to be suppressed is necessary.

On December 15, 1997, Johnson, together with eight others was indicted and charged with violating the RICO statute and predicate acts of murder, conspiracy, attempted murder, narcotics conspiracy; RICO conspiracy; conspiracy to commit murder in aid of racketeering; using and carrying a firearm in relation to a crime of violence; and, murder in aid of racketeering. The criminal activity with which he was charged was alleged to extend from January, 1993 to November, 1997. Warrants for the arrest of all the defendants were issued on December 15th and six were arrested the following day and two others within days thereafter. Johnson eluded arrest until March 22, 1998, when he was found to be in possession of crack cocaine by New York City Housing Police and arrested on a state narcotics charge. He identified himself then as "Jamel Lane" and was so named in the charge against him in the state court. Notwithstanding his assumed name, his true identity was soon revealed and the existence of an outstanding federal arrest warrant was noted. The Federal Bureau of Investigation (F.B.I.) was notified of his arrest and New York Police Detectives Norman and Walsh proceeded to the Kings County Criminal Court to execute the arrest warrant. Upon arriving at the courthouse, the detectives notified the Assistant District Attorney and the Court Officer of the outstanding warrant and of their intent to arrest him immediately following his arraignment. An attorney was appointed to represent Johnson on the state charge. He never represented Johnson in the federal case. The record of the proceeding in the Criminal Court, attached as Exhibit A to the Government's Memorandum in Opposition to this motion reads as follows, in its entirety:

Court Officer: Calling docket ending 3670. Jamel Lane. Step out. He also has an FBI warrant.

Mr. Winerich: Johnathan Winerich, for the defendant.

Mr. Cotto: Wilfredo Cotto, for the People. People serving 190.50. 710.31 A. The substance: I was just hanging out. I do not live in the building. 240.30, 250.20. People consent to ROR in this matter.

The Court: ROR on consent, that's because of the warrant?

Mr. Cotto: Yes

The Court: AP–1. What date are you asking for?

Mr. Winerich: April 14th.

The Court: April 14th. Are you serving cross?

Following his arraignment, Johnson was taken to FBI headquarters in Manhattan, advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and made the statements which are the subject of this motion to suppress. On the same day, March 23, 1998, Johnson appeared before Magistrate Judge Gold, counsel was assigned, and he pleaded not guilty.

This suppression motion is bottomed entirely upon what the defendant alleges occurred at the time of his appearance in the Kings county Criminal Court which is described in the following affirmation dated May 19, 1998 by an attorney duly admitted in the State of New York, who under penalty of perjury, hereby affirmed that:

1. On March 23, 1998, I was working the Part AR–1 in Kings County Criminal Court. I was assigned to represent Jamel Lane under Dkt. No. 98K023670. Mr. Lane was charged with a serious narcotics felony.

2. I was informed at that time by FBI agents present in the courtroom and by the court itself that there was an FBI warrant outstanding for the defendant under the name "John Johnson," and that the FBI would be arresting Mr. Johnson if he were released. I am informed that this is the same John Johnson who is the subject of the above captioned indictment.

3. The Kings County District Attorney and I agreed that Mr. Johnson would be released in his own recognizance on the understanding that he would be arrested immediately by the FBI agents present in the courtroom.

4. The Court released Mr. Johnson on his own recognizance, and he was immediately arrested by the FBI.

5. I personally informed the FBI agents that I was Mr. Johnson's attorney and that they should not interrogate him.

Johnson does not dispute that he was thereafter fully advised of his rights by the federal agents, that he understood them and voluntarily made the statements he now seeks to suppress. It is his claim that ignoring the admonition of the attorney, FBI agents questioned him and his incriminating statements were thus made in response to and obtained in violation of his Sixth Amendment rights.

 In his Memorandum of Law in Support of his motion (Def.Mem.) Johnson advances premises which should be addressed at the outset. He asserts that his "Criminal Court arraignment marked, for all practical purposes, the invocation of adversarial proceedings on the federal indictment." (Def.Mem. at 4–5). He is wrong. There is no indication that the federal indictment was in the criminal courtroom, let alone the defendant being asked to plead to it, even assuming that a state criminal court judge would presume to arraign a defendant on a federal indictment. But more significantly, the federal indictment was filed more than three months prior to Johnson's arrest on the state charge and it is hornbook law that adversary judicial proceedings are initiated either by "formal charge, preliminary hearing, *indictment*, information or arraignment," *Kirby v. Illinois*, 406 U.S. 682, 688–89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (emphasis added) and his Sixth Amendment rights accrued at that time. He also asserts that "The District Attorney acted on behalf of and at the behest of the FBI to secure Mr. Johnson's presence in Federal Court. In negotiating the bail package, the district attorney represented the federal government's interests and the defense attorney represented Mr. Johnson's interests in the federal proceeding." (Def.Mem.5) The sparse transcript of the proceeding in the Criminal Court reprinted above cannot support those inferences even assuming that the assistant district attorney would presume to deputize himself an assistant United States Attorney and represent the federal government. The assertion that the attorney represented Mr. Johnson's interests in the federal proceeding is flatly contradicted by a later affirmation under penalty of perjury executed by him on December 28, 1998, in which he affirms that he never represented Johnson in the federal case; never advised Johnson or anyone else that he represented him in the federal case; never believed or understood himself to be representing Johnson in the federal case and had no involvement in it other than his awareness that Johnson would be arrested by federal agents on a federal warrant after being released on his own recognizance in the state case; that he has no specific recollection of instructing the federal agents not to question him and has no specific recollection of any specific conversation with the agents to that effect, but believes that he so instructed them based on his general practice

of advising detectives not to question defendants.

In yet another declaration, under the penalty of perjury pursuant to 28 U.S.C. § 1746, dated just three days later, December 31, 1998, the same attorney states that he was recently asked by the government "to make a declaration relative to my actions in representing John Johnson ... at an arraignment in Kings County Criminal Court, March 23, 1998;" that the government drafted the declaration for him which he signed "but told the government that he wanted to review certain matters before the declaration was submitted" and requested the government not to submit the declaration as written and that it does not accurately express his understanding of his role at the Criminal Court arraignment. He goes on to explain that when, in his December 28th declaration he stated under penalty of perjury that "I never represented Johnson (Lane) in the federal case" and that "I never advised Johnson or anyone else that I represented Johnson in the federal case" he meant by that "that [he] would not be engaged by CJA for that purpose and that [he] would not receive separate compensation for [his] work in the federal matter. [He] did not mean that [he] did not advise Mr. Johnson on both the state and the federal criminal matters. [He] did not mean that [he] did not represent him on the federal matter from the time he came into state court until he (Johnson) was appointed new counsel in federal court." The inconsistencies between the attorney's declarations of December 28th and December 31st are glaring.

The defendant also asserts that "Defense counsel discussed the federal charges with both Mr. Johnson and the federal agents. Any suggestions that the federal indictment was unrelated to the Criminal Court proceedings is belied by the record." (Def.Mem.5) A microscopic reading of the attorney's affirmations fails to reveal any suggestion that he discussed the federal charges with Mr. Johnson and the federal agents or even knew what the federal charges were. Nor is there anything in the record upon which the defendant relies in support of his motion to justify the assertion that the federal indictment is related to the Criminal Court proceeding. As will be subsequently discussed, the relationship between them, if at all, is tenuous at best.

The court was troubled by three sworn declarations of the attorney who represented Johnson at his arraignment on state charges and on the assertions made on behalf of Johnson in the Memorandum of Law in support of his motion and directed a hearing which was held. Testimony was elicited from that attorney and from the two detectives who arrested Johnson immediately following his release in the state court. The attorney's attempt to reconcile the flagrant inconsistencies in his three sworn declarations was convoluted and unconvincing. His testimony also belied his statement in his last declaration, dated December 31st, 1998, that "he told the government that he wanted to review certain matters" in his declaration of December 28th, signed and faxed to the government on that day, before it was submitted and "requested the government not to submit it as written." See government exhibits 1 and 2.[1] He was less than certain about whether he instructed the detectives not to interrogate Johnson.

Detective Norman testified unequivocally that he was never instructed not to interrogate Johnson. Detective Walsh testified that he never spoke with the attorney, never appeared in the well of the court or in the holding pen where Detective Norman took custody of Johnson. Each of the attorney's declarations submitted, however, state that the attorney cautioned both not to interrogate Johnson. The testimony of Detectives Norman and Walsh, based upon any objective assessment, was credible and compels the conclusion that the attorney's "belief"

---

1. The facsimile transmission cover page from the government to the attorney reads: "please review this affidavit for accuracy. If it's correct please sign it and fax it back to me (718) 254–6765—if it's wrong (spelling of your first name) please call me at (718) 254–6765 to correct any mistakes. Thanks. Kelly" (AUSA Kelly Moore) Government exhibit 2.

Government exhibit 1 is the facsimile cover sheet from the attorney to the government and reads: "Dear AUSA Moore: Enclosed please find my affidavit." Signature.

that he instructed them as claimed is a mistaken one and the testimony of Detective Norman fortifies that conclusion.

 Given that finding, the remaining question is whether the mere fact that the defendant was represented by counsel at an arraignment on state charges, precluded his interrogatories on the federal offenses for which he was already indicted and requires suppression of the statements he made after being fully advised of his Miranda rights and knowingly and intelligently waived them.

### Discussion

The overlap between the Fifth and Sixth Amendments and the necessity of drawing the line which separates the appropriate application of one from the other has been the issue the Supreme Court has been called upon to address in several relatively recent cases as time is measured in the law. The drawing of subtle distinctions required to fix that line "may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field." *See* LaFave, "Case by Case Adjudication" versus "Standardized Procedure": The Robinson Dilemma, 1974 S.Ct.Rev. 127, 142.

The distinction between the two may be put in a nutshell: The Fifth Amendment spawned *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) which seeks to protect an accused against custodial interrogation before being advised of his right to remain silent and to the assistance of counsel before adversary judicial proceedings have commenced. The Sixth Amendment provides that in all criminal prosecutions the accused has the right to the assistance of counsel, to have him investigate the case and prepare a defense for trial. That right attaches during or after the beginning of adversary judicial proceedings. As has been observed in another context, however, it is one thing to put the two rights in a nutshell, it is quite another thing to keep them there. *See* Leach, Perpetuities in a Nutshell, 51 Harv.L.Rev. 638 (1938). A review of the cases which have grappled with the necessity of drawing the line, for the sake of convenience, will begin with *Maine v. Moulton,*

474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

In that case the defendant, represented by counsel, pleaded not guilty in state court to the crime of theft of auto parts with which he and a co-defendant were charged. His co-defendant thereafter agreed to cooperate with the police and to record conversations between himself and Moulton during which inculpatory statements were made by Moulton and led to his indictment on additional charges of burglary, arson and three more thefts. The Court held that the recorded statements by Moulton should have been suppressed stating that the Sixth Amendment right to counsel having attached when he pleaded not guilty in the state court, the police knowingly circumvented Moulton's right to have counsel present at a confrontation between him and his codefendant who was deemed to be an agent of the police. The holding in *Moulton* was years before pre-ordained in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

Soon thereafter, the Court had before it *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) in which the sister of the defendant who was arrested but not yet arraigned, attempted to get a lawyer for him. A lawyer she contacted telephoned the police station at which the defendant was being held and was assured that the defendant would not be questioned until the next day. In fact, he was questioned later that same day and made an inculpatory statement after being warned of his Miranda rights and voluntarily and knowingly waived them. The defendant sought to suppress that statement. The issue as framed by the Court was "whether a pre-arraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him." 475 U.S. at 419, 106 S.Ct. 1135. The Court, in deciding that his Fifth Amendment rights were not violated, held that events occurring outside the defendant's presence and unknown to him have no

bearing on his capacity to knowingly and voluntarily waive his constitutional rights. The Court went on to state that the "Constitution did not require the police to supply him with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand on his rights." 475 U.S. at 420, 106 S.Ct. 1135. Because the incriminating statements made by the defendant were made before the commencement of adversary judicial proceedings, the Sixth Amendment was not applicable.

In *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) the defendant, in the presence of police at arraignment, requested counsel. Thereafter, in the absence of counsel, the police obtained a statement from him after giving him his Miranda warnings. The defendant objected to the admission of his statement at trial which was overruled. The question before the Court was whether the principle of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), namely, that an accused in custody who requested counsel cannot be interrogated until counsel has been made available to him, unless he himself initiates further conversation with the police—applied in a Fifth Amendment context—is applicable here, in a Sixth Amendment context. The Court held that it was, stating that "[i]f police initiate an interrogation *after a defendant's assertion of his right to counsel, at an arraignment or similar proceeding*, ... any waiver of [the defendant's right to counsel] for that police-initiated interrogation is invalid." 475 U.S. at 625, 106 S.Ct. 1404 (emphasis added).

*Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) is particularly instructive. Patterson was suspected of murder, arrested, advised of his Miranda rights and after waiving them, denied any knowledge of it. He was indicted shortly thereafter and, after waiving his Miranda rights, gave the police a lengthy statement concerning the murder. Later that day, after once again being advised of his rights by an Assistant State's Attorney, he gave another inculpatory statement. At no time did he exercise his right to have counsel present. He moved to suppress his statements con-

tending that his Sixth Amendment rights having arisen upon indictment, the police were thereafter barred from initiating a meeting with him, equating himself with a pre-indictment suspect who asserts his Fifth Amendment right while being interrogated and who, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) may not be interrogated again unless he initiates the meeting. In affirming the denial of his motion to suppress, the Court expressed its view of the controlling principles which are very apposite here. The Court said that in a case such as this, the key inquiry must be "Was the accused who waived his Sixth Amendment rights during post indictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forego the aid of counsel? In this case, we are convinced that by admonishing the petitioner with the *Miranda* warnings, respondent has met this burden and that petitioner's waiver of his right to counsel at the questioning was valid." 487 U.S. at 292, 108 S.Ct. 2389. The Court went on to hold that "it is our view that whatever warnings suffice for Miranda's purposes will also be sufficient in the context of post indictment questioning. The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities. With respect to this inquiry, we do not discern a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at post indictment questioning ... So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during post indictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" 487 U.S. at 298–300, 108 S.Ct. 2389.

The clear significance of *Patterson* for this case is that the defendant does not dispute that after his arrest by the federal agents he was made aware of the dangers and disad-

vantages of self-representation during post-indictment questioning having been given the *Miranda* warnings, nor does the defendant dispute that his waiver of the rights of which he was advised was knowing and voluntary. *Patterson* is thus dispositive and requires the denial of Johnson's motion. *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) is also instructive.

McNeil was arrested in Omaha, Nebraska in 1987, pursuant to a warrant charging him with an armed robbery in a suburb of Milwaukee, Wisconsin. Two deputy sheriffs from Milwaukee County came to Omaha to retrieve him. They advised him of his Miranda rights and sought to question him. When he refused to answer, the questioning ceased. He did not request an attorney. Back in Wisconsin, McNeil was represented by a Wisconsin public defender at an appearance before a Milwaukee County Court on the armed robbery charge where bail was fixed and a preliminary examination scheduled. McNeil was visited in jail later that evening by a Joseph Butts, a Milwaukee County detective who was assisting the police of Racine County in investigating a murder, attempted murder and armed burglary in the town of Caledonia. McNeil was a suspect in those crimes. Butts advised McNeil of his Miranda rights and he waived them. He did not deny knowledge of the Caledonia crimes, but denied involvement in them.

Two days later, Butts returned with detectives from Caledonia. McNeil was again advised of his Miranda rights and he waived them. On this occasion, he admitted his involvement in the Caledonia crimes. His statement was reduced to writing and he signed it. Two days after that, McNeil was again interviewed after being advised of his Miranda rights and gave another statement describing the events surrounding the Caledonia crimes which was also reduced to writing and signed by him. The next day, McNeil was formally charged with the Caledonia crimes. His pre-trial motion to suppress his incriminating statements was denied and he was convicted of those crimes. On appeal, McNeil contended that his courtroom appearance with an attorney for the Milwaukee suburb crime was an invocation of the Miranda right to counsel and any subsequent waiver of it during police interrogation regarding any crime was invalid. The Supreme Court decided that McNeil's invocation of his Sixth Amendment right to counsel during the initial judicial proceeding was not an invocation of the right to counsel in furtherance of The Fifth Amendment's Guarantee against compelled self-incrimination announced in *Miranda.*

In *Michigan v. Jackson,* supra, the Court wrote, it "held that once [the Sixth Amendment] right to counsel has attached *and has been invoked,* any subsequent waiver during a police-initiated custodial interview is ineffective." 501 U.S. at 175, 111 S.Ct. 2204. (emphasis added). It is once again noted that adversarial judicial proceedings had been commenced by Johnson's indictment in this case and that his Sixth Amendment right to counsel which attached at that time was never invoked by him with respect to that indictment. On the contrary, he explicitly waived it.

"The Sixth Amendment," said the Court, "is offense specific.... And just as the right is offense specific, so also its *Michigan v. Jackson* effect of invalidating subsequent waivers in police initiated interviews is offense specific." 501 U.S. at 175, 111 S.Ct. 2204. The defendant here, as in McNeil, also relies upon a different right to counsel, "found not in the text of the Sixth Amendment, but in this Court's jurisprudence relating to the Fifth Amendment ..." 501 U.S. at 176, 111 S.Ct. 2204 and seeks to combine the two of them, contending that although conceding that he waived his Miranda right to counsel, the waiver was invalid because his offense specific Sixth Amendment right that accrued upon his arraignment on the State charge was also an invocation of the non-offense specific Miranda–Edwards right. The court found that contention "false as a matter of fact and inadvisable (if even permissible) as a contrary-to-fact presumption of policy." 501 U.S. at 177, 111 S.Ct. 2204. "To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the Miranda–Edwards interest." 501 U.S. at 178, 111 S.Ct. 2204. The Court went on to observe that requesting the assistance of an

attorney at a bail hearing is not an expression of a desire "for the particular sort of lawyerly assistance that is the subject of Miranda. It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting an attorney at a bail hearing does not bear that construction. '[T]o find that [the defendant] invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request.'" 501 U.S. at 178–79, 111 S.Ct. 2204 (citations omitted). That observation has a particularly meaningful resonance for this case. See also United States v. McKinley, 84 F.3d 904 (7th Cir.1996) (in which that observation was dispositive in a case closely resembling this one).

■ The defendant suggests the applicability, in any event, of what has been referred to as a narrow exception to the McNeil rule which is triggered when an accused has been represented by counsel on state charges and subsequently questioned by federal authorities concerning an offense that is "extremely closely related" or "inextricably intertwined" with the state law charges. See United States v. Arnold, 106 F.3d 37 (3rd Cir.1997) (the terms "closely related" or "inextricably intertwined" taken to mean that the right to counsel will carry over from the pending charge to the new charge only where the new charge arises from the same acts and factual predicates on which the pending charges were based). In determining whether the same acts and factual predicates underlie both charges, courts have looked for similarities of time, place, person and conduct. 106 F.3d at 41. See also United States v. Kidd, 12 F.3d 30, 32 (4th Cir.1993); Hendricks v. Vasquez, 974 F.2d 1099, 1104–05 (9th Cir.1992); United States v. Carpenter, 963 F.2d 736, 740–41 (5th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992); United States v. Hines, 963 F.2d 255, 257–58 (9th Cir.1992). The factors looked for to determine whether the cases are closely related are entirely absent here aside from the fact that the sale of crack is present in both.

As has already been noted, the criminal activity charged in this federal indictment is alleged to extend from January, 1993 to November, 1997. The indictment was returned on December 15, 1997, and charges Johnson with a number of serious crimes other than narcotics offenses. The investigation leading to the indictment and the evidence before the grand jury could not have included the conduct for which Johnson was arrested on state charges months later. The similarities of time, place, persons and conduct are absent and preclude the application of the closely related exception to McNeil.

Johnson's reliance upon Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) is not persuasive. Brewer, almost always referred to as the Christian burial case, is too familiar to warrant an extended discussion of the facts. It is significant to recall, however, that the court there wrote at 405–06 that:

The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams could not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not.

There is nothing to suggest that under the circumstances of this case Johnson did not waive his rights under the Sixth and Fourteenth Amendments. For all of the reasons stated above, Johnson's motion to suppress his statements is denied.

■ Johnson has also moved this court for an order that would direct that every reference to him by his alias "Gotti" be stricken as being irrelevant and prejudicial. Reference to a defendant by his name and alias is permissible if the government intends to offer evidence of that alias as being necessary to identify the defendant in connection with the crimes charged. In that event, the alias is relevant. The fact that it may also be prejudicial is not fatal if it will be admissible as part of the government's proof at trial. See United States v. Persico, 621 F.Supp. 842, 860 (S.D.N.Y.1985). The government represents that it will offer proof of John-

son's alias at trial and will prove that he used that alias in the course of the offenses with which he was charged. The government also represents that some of its witnesses claim to know Johnson only by his alias. The motion to strike the alias is, therefore, denied. *See also United States v. Bye,* 1990 WL 58897*4 (S.D.N.Y.1990); *United States v. Payden,* 613 F.Supp. 800, 823 (S.D.N.Y.1985).

 The defendant Kearse moves for an order that would require the government agents to preserve the handwritten notes they made during their investigation of this case. It is well settled in this Circuit that handwritten notes need not be preserved if those notes are incorporated into formal reports. *United States v. Elusma,* 849 F.2d 76, 78 (2d Cir.1988) *cert. denied,* 489 U.S. 1097, 109 S.Ct. 1570, 103 L.Ed.2d 936 (1989); *United States v. Barlin,* 686 F.2d 81, 92 (2d Cir.1982); *United States v. Jennings,* 1998 WL 865617 (N.D.N.Y.1998). This motion is, therefore, denied.

The defendants have moved for a bill of particulars. In substance, their requests seek disclosure of the exact dates, times and locations of the alleged participation of each defendant in the conspiracy with which he is charged, the exact names and addresses of all the co-conspirators and the approximate amount of the narcotics the distribution of which is alleged to have been the object of a conspiracy. As to the latter, the weight of a controlled substance is not an element of the offense, but is relevant for sentencing and is not properly the subject of a bill of particulars.

Federal rule of Criminal Procedure 7(f) requires that a bill of particulars be furnished when the indictment fails to sufficiently inform a defendant of the crimes with which he is charged. A bill of particulars is not a vehicle for obtaining the government's evidence or for obtaining the details of how the crimes charged will be proved. In *United States v. Desantis,* 802 F.Supp. 794, 797–98 (E.D.N.Y.1992) this court wrote that:

> Rule 7(f) ... permits a defendant to seek a bill of particulars to identify with specificity the nature of the charge pending against him so that he may prepare for trial, avoid surprise and to be able to claim double jeopardy should he be prosecuted again for the same offense.... The decision to grant or deny a request for a bill of particulars rests within the sound discretion of the court.... As a general rule if the information the defendant seeks is to be found in the indictment or in some acceptable alternative form, no bill of particulars is required.

*See also United States v. Crozzoli,* 698 F.Supp. 430, 435–36 (E.D.N.Y.1988). The indictment, together with the discovery already provided the defendants, notify them with the particularity to which they are entitled of the charges against them enabling them to prepare for trial without surprise and to raise the bar of double jeopardy should that become necessary. *United States v. Tramunti,* 513 F.2d 1087 (2d Cir.) *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (defendants not entitled to discover exact time and place at which crime occurred, the identities of witnesses or documents that will prove the crimes charged); *United States v. Aliperti,* 867 F.Supp. 142 (E.D.N.Y.1994) (as a general rule, defendants not entitled to detailed evidence about a conspiracy to properly prepare for trial).

For the foregoing reasons, the motion for a bill of particulars is denied.

SO ORDERED.